# SUPREME COURT,

## STATE OF KANSAS.

## JANUARY TERM, 1885.

PRESENT:

HON. ALBERT H. HORTON, CHIEF JUSTICE.
HON. DANIEL M. VALENTINE, } ASSOCIATE JUSTICES.
HON. WILLIAM A. JOHNSTON,

## EDWIN AVERY v. EMILY J. AVERY.

1. DIVORCE—*Extreme Cruelty.* Any unjustifiable conduct on the part of the husband, which so grievously wounds the mental feelings of the wife, or so utterly destroys her peace of mind, as to seriously impair her bodily health or endanger her life, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes extreme cruelty, although no physical or personal violence is inflicted or even threatened. (*Carpenter v. Carpenter*, 30 Kas. 744.)

2. EVIDENCE *Showing Extreme Cruelty.* A., aged forty-two, married his second wife, Miss W., aged thirty-six; they were only slightly acquainted before marriage, their courtship being solely by letters; A. was rough and uncouth in his deportment and expressions; Miss W. had been a missionary for a short time among the Osage Indians, and also the matron of the Home of the Friendless, at Leavenworth, in Kansas; she was spoken of by the witnesses "as a perfect lady, and as of an amiable and good disposition;" at the time of the marriage Miss W. brought to her husband only a box of bed clothing and a trunk of wearing apparel. During their marriage there was born to them a girl, named by them Bessie. They lived together a little over five years, and then the wife, with the consent of her husband, went·upon a visit to her relatives in Pennsylvania. About this time, the husband made up his mind not to live with his wife any longer. Prior to her departure, he was very cross to her, hardly ever speaking pleasantly to her, and continuously saying and doing things that hurt her feelings. On several occasions he said

to her, in the presence of others, "that Bessie"— their only child—"did not appear like his children, and that he did not believe she was his child." After the wife went to Pennsylvania, he wrote her a series of letters filled with fault-finding and vilification. These letters were not merely unkind, but were of a character to render the life of his wife as miserable and wretched as his words and writings could possibly do. He sent her a valentine through the mail, representing an ugly and somewhat elderly female nursing an infant from a bottle, and upon the margin of the valentine he had one of the employés in the post office write, before it was mailed: "I like children of my own." Upon the return of his wife to Kansas, from her visit, he stated to one of his neighbors, "That he would as soon meet the devil as to meet his wife; that she was fair to the eye but rotten at heart;" he also accused her, upon her return, without any reason therefor, of having committed abortions upon herself. *Held,* That the conduct and letters of the husband sustain the finding of the trial court, that the husband was guilty of "extreme cruelty" to his wife. *Held further,* That the trial court did not abuse its discretion when it allowed as alimony to the wife one-half of the farm owned by the husband, valued at about five thousand dollars.

3. CHILD — *Control of Mother—Decree, Not Erroneous.* At the time of the trial, Bessie, the child of the parties, was in Pennsylvania, where she had been taken by her mother. *Held,* That she was at least constructively under the control of her mother, and that the decree of the court (rendered upon personal service on the husband, and after an answer had been filed by him) committing her care and custody to her mother, only determined the right of the parties *inter sese,* and therefore was not without jurisdiction, or erroneous. The decree in no manner concludes other courts as to the best interests of the child. (*In re Bort,* 25 Kas. 308.)

### Error from Nemaha District Court.

ACTION for divorce, brought by *Emily J. Avery* against *Edwin Avery.* Trial at the April Term, 1884, and judgment for plaintiff. The defendant alleges error, and brings the case to this court. The opinion states the material facts.

*J. A. McCaul,* for plaintiff in error.

*Conwell & Wells,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: Action by Emily J. Avery against Edwin Avery, for divorce, alimony, and the possession of a minor child. The facts in the case are substantially as follows: The

marriage of the parties took place at St. Joseph, Missouri, on October 24, 1877; Mrs. Avery was then thirty-six years old, and Mr. Avery, forty-two years; it was the first marriage of Mrs. Avery, and the second marriage of Mr. Avery — his first wife having died a year and six months prior thereto, leaving as the issues of such marriage two boys, respectively of the ages of seven and four, and one girl about one year old. While Mr. Avery and his first wife were living together near Sabetha, Nemaha county, Mrs. Avery — then Emily J. Williams — visited relatives in the vicinity. At that time the parties to this action became slightly acquainted with each other. After the death of the first wife, Mr. Avery opened a correspondence with Miss Emily J. Williams, at her home in Pennsylvania. The correspondence resulted in their marriage. On the day following the marriage, the parties went directly from St. Joseph to the farm of Mr. Avery, near Sabetha, where they resided together until February 14, 1883, and during this time their only child, Bessie L. Avery, was born. On February 14, 1883, with the consent of the parties, Mrs. Avery went to visit her relatives at her former home in Pennsylvania — her husband giving her fifty dollars to go with. Soon after her departure, Mr. Avery advertised the sale of his personal property and sold the same, first selecting such articles as remained of the clothing and personal effects brought to their home by Mrs. Avery at the time of their marriage, and, putting the same in a box, took them to the residence of a relative of Mrs. Avery at Sabetha, and left them there for her. On April 3, 1883, Mr. Avery wrote to a cousin of Mrs. Avery that he had broken up housekeeping, rented his farm for two years, that he would never keep house again, and that he was going to take his children to his mother's in Rooks county. In June following, he wrote to his wife that he was going to get a divorce. At the time of his second marriage, Mr. Avery was the owner of a farm near Sabetha, of 160 acres, worth about $5,000. He continued to reside upon this farm with his wife and all his children, until Mrs. Avery went to Pennsylvania, in 1883. His second wife, Mrs. Emily J. Avery, at

the time of her marriage, outside of a box of bed clothing and a trunk of wearing apparel, was destitute of other property. The court granted Mrs. Avery a divorce on the ground of extreme cruelty; gave her as alimony, the west 80 acres of her husband's farm, and the custody of the minor child, Bessie.

It is contended that the judgment is not sustained by the evidence. We think otherwise. It is a misfortune of the parties that they were not better acquainted with each other before their marriage. Their courtship was solely by letters. Mr. Avery was rough and uncouth in his deportment and in his expressions. In 1875, Mrs. Avery — then Miss Williams — was a missionary to the Osage Indians, and afterward was the matron of the Home of the Friendless, at Leavenworth, in this state. Several of the witnesses spoke of her as "a perfect lady." One witness, who had known her for several years at Sabetha and Leavenworth, testified "that she was a first-class woman and devoted christian; that she was of an amiable and good disposition, and one of the best of women and mothers; that when at Leavenworth she was regarded as one of the best ladies there." Another lady who visited them about six months, when their little girl was a year and a half old, testified "that during the time she was there, Mrs. Avery always treated her husband kindly and considerately, and when abused by him would not answer back, but usually walked away and cried about it; that she always treated her husband's children by his first wife as well as she did her own, and seemed to take as much interest in them; that she became acquainted with her in 1876, at Leavenworth, Kansas, and always found her a pleasant and agreeable person, and one easy to get along with."

Considering all the circumstances brought out upon the trial, there was no excuse for the conduct and writings of Mr. Avery, unless he was *non compos mentis*. Indeed, a part of the defense seems to have been based upon this theory, on account of an injury which he had received several years ago, from a stone falling upon his head. One of the physicians testified that "when excited, he seemed more like a crazy man

than a sane one." The trial court, however, from the findings, must have considered him of sound mind, and the question is: Did the conduct and letters of Mr. Avery establish extreme cruelty?

It is evident from the evidence, that when Mrs. Avery left to visit her relatives in Pennsylvania, Mr. Avery made up his mind not to live with her any longer. Prior to her departure he was very cross to her, hardly ever speaking pleasantly to her, and continuously saying and doing things that hurt her feelings. He was wont to say to her that "she had a hellish, or devilish tongue." On several occasions he said to her, in the presence of others, "that Bessie"—their only child—"did not appear like his children, *and that he did not believe she was his child.*" After she went to Pennsylvania, he wrote her a series of letters filled with fault-finding and vilification. These letters were not merely unkind, but were of a character to render the life of his wife as miserable and wretched as his words or writings could possibly do. Before the commencement of this action, and a few days prior to February 14, 1884, he sent his wife, through the mail at Sabetha, a valentine representing an ugly and somewhat elderly female nursing an infant from a bottle, and upon the margin of the valentine he had one of the employés in the post office write, before it was mailed, "I like children of my own." He had the employé also write the address on the envelope. Upon the return of his wife to Kansas, he said to Mr. Rogers, living at Sabetha, that "he would as soon meet the devil as to meet his wife; that she was fair to the eye, but rotten at heart." He also accused her, upon her return, without any reason therefor, of having committed abortions upon herself.

It was said in *Carpenter v. Carpenter*, 30 Kas. 744:

"It was formerly thought that to constitute extreme cruelty, such as would authorize the granting of a divorce, physical violence is necessary; but the modern and better-considered cases have repudiated this doctrine, as taking too low and sensual a view of the marriage relation, and it is now very generally held, that any unjustifiable conduct on the part of either the husband or the wife, which so grievously wounds the men-

tal feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health or endanger the life of the other, or such as in any other manner endangers the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes 'extreme cruelty' under the statutes, although no physical or personal violence may be inflicted, or even threatened."

Within the law as therein declared, Avery was guilty of extreme cruelty.

It is further contended that the court abused its discretion, when it gave to the wife one-half of the farm.    Sec. 646 of the code provides:

"When a divorce shall be granted by reason of the fault or aggression of the husband, the wife shall be restored to all her lands, tenements and hereditaments not previously disposed .of, and restored to her maiden name, if she so desires, and shall be allowed such alimony out of her husband's real and personal property as the court shall think reasonable, having due regard to the property which came to him by marriage, and the value of his real and personal estate at the time of said divorce, which alimony may be allowed to her in real or personal property, or both."

In view of all the circumstances of the case, although the alimony allowed was liberal, we are not prepared to say it was unreasonable or exorbitant; therefore, we cannot say that the trial court abused its discretion in this regard.

Finally, it is urged that as Bessie, the child of the parties, had been left by Mrs. Avery in Pennsylvania, upon her return to Kansas, and was on the day of the trial in that state, she was not within the jurisdiction of the trial court, and therefore that it was erroneous to grant her custody to her mother.    While the child was at her grandfather's, in Pennsylvania, she was at least constructively under the control of Mrs. Avery.    The decree committing the care and custody of this minor child to her mother, only determined the right of the parties *inter sese*, and therefore was not erroneous, or without jurisdiction.    This decree in no manner concludes other courts as to the best interests of the child.    (*In re Bort*, 25 Kas. 308.)

The orders and judgment of the district court will be affirmed.

All the Justices concurring.